STEVE W. BERMAN (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*steve@hbsslaw.com*

ELAINE T. BYSZEWSKI (SBN 222304)
CHRISTOPHER R. PITOUN (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
*elaine@hbsslaw.com*
*christopherp@hbsslaw.com*

Attorneys for Plaintiffs and the Proposed Class

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., and LORI GRASS, on behalf of herself and all others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>WHOLE FOODS MARKET SERVICES, INC., a Delaware corporation; WHOLE FOODS MARKET CALIFORNIA, INC., a California corporation; MRS. GOOCH'S NATURAL FOOD MARKETS, INC., a California corporation,<br><br>     Defendants. | Case No. 5:15-cv-4301-NC<br><br><u>CLASS ACTION</u><br><br>**THIRD AMENDED COMPLAINT FOR VIOLATION OF CALIFORNIA CONSUMER PROTECTION LAWS**<br><br>DEMAND FOR JURY TRIAL |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      OVERVIEW ................................................................................................ 1

II.     PARTIES ................................................................................................... 3

III.    JURISDICTION AND VENUE ................................................................. 5

IV.     FACTUAL ALLEGATIONS ..................................................................... 6

        A.      Whole Foods Uses GAP's 5-Step® Rating System to
                Advertise Its Meat Products. .................................................... 6

        B.      Whole Foods Uses the 5-Step® Rating System to Extract
                a Price Premium from Consumers. ......................................... 13

        C.      The GAP Audit Process Does Not Ensure Compliance
                with its Standards. .................................................................. 16

        D.      Key Standards in the 5-Step® Rating System Fail to
                Ensure a Significant Improvement In Animal Welfare
                Over Standard Industry Practice. ........................................... 18

                1.      Chickens and Turkeys .................................................. 18

                2.      Pigs ............................................................................... 21

                3.      Cattle ............................................................................ 25

V.      CLASS ACTION ALLEGATIONS ......................................................... 26

VI.     CAUSES OF ACTION ............................................................................ 29

THIRD AMENDED COMPLAINT
010529-11  851056 V2

Plaintiff People for the Ethical Treatment of Animals, Inc., brings this action on behalf of itself and Plaintiff Lori Grass brings this action on behalf of herself and all others similarly situated ("Plaintiffs") against Whole Foods Market Services, Inc., Whole Foods Market California, Inc., and Mrs. Gooch's Natural Food Markets, Inc. (collectively "Whole Foods" or "Defendants").  Plaintiffs' allegations against Defendants are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon each Plaintiff's personal knowledge.

## I.   OVERVIEW

1.     A grocery store that markets itself as a business concerned with animal welfare and high quality meat products should ensure that its animal treatment standards are actually enforced.  And such a store's standards for purportedly superior animal treatment should not merely mimic industry standards.  This is especially true if the store prolifically advertises its efforts to promote animal welfare and seeks a premium price from consumers seeking to purchase a more humanely treated, higher quality animal product.  When a grocery store's standards for improved animal welfare are not actually enforced or do not require meaningfully better treatment for meat animals compared to the industry standard, consumers are deceived into paying a higher price for meat that fails to offer the benefit they seek.  Such a grocery store should be required to return this premium to its customers.

2.     Whole Foods is a nationwide grocer advertising and selling a wide array of food products, including unprepackaged chicken, turkey, pork, and beef (collectively "Meat Products").

3.     The core of the Whole Foods business model is to sell premium products at premium prices.  To ensure the premium nature of its Meat Products and appeal to those concerned about animal welfare, Whole Foods advertises its Meat Products as subject to a multi-step certification program.

- 1 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4.      Whole Foods advertises and sells Meat Products using the 5-Step® Animal Welfare Rating system ("5-Step® Rating System").  The 5-Step® Rating System outlines specific practices that are alleged to promote animal welfare through a five-step program.  Step 1 requires that Whole Foods suppliers "focus intently on the welfare of their animals and meet approximately 100 species-specific standards."[1]  Whole Foods requires at least a Step 1 rating for Meat Products sold in its retail stores.  For Steps 2-5, and 5+, Whole Foods represents that each successive step requires progressively more intense animal-centered practices.

5.      But the 5-step certification program is not actually enforced against Whole Food's chicken, turkey, pork, and beef suppliers in a meaningful way.  In fact, the entire audit process for Whole Foods' animal welfare standards is a sham because it occurs infrequently and violations of the standards do not cause loss of certification.  Indeed, a supplier can be out of compliance *for multiple years* without losing its certification.  Standards that are not actually enforced create a false impres-sion of ensuring a more humanely treated, higher quality animal product – when in fact they ensure no such thing.  Had Plaintiff Grass and Class members known the truth they would not have purchased the Meat Products or paid as much for them.

6.      Moreover, key certification standards barely exceed common industry practices, if at all.  The 5-Step® Rating System was developed by the Global Animal Partnership ("GAP").  Whole Foods describes GAP as a non-profit organization dedicated to improving animal welfare through the implementation of its 5-Step® Rating System.  Whole Foods is a founding member and major funder of GAP.

7.      In the meat section of its retail stores, Whole Foods advertises using signs, placards and even napkins inundating consumers with information about its

---

[1] Whole Foods Market, *5-Step® Animal Welfare Rating,*
http://www.wholefoodsmarket.com/mission-values/animal-welfare/5-step-animal-welfare-rating (last visited July 15, 2015).

- 2 -

commitment to the humane treatment of meat animals. These signs, placards and napkins identify the GAP's 5-Step® Rating System as the central methodology Whole Foods uses to ensure that animals are humanely treated.

8.       In the course of advertising and selling its Meat Products, Whole Foods materially omits and does not adequately disclose that key animal treatment standards required under the 5-Step® Rating System are no better or marginally better than is the common practice in the industry. Thus, they create the false impression of ensuring improvement to animal welfare and superior quality Meat Products. Had Plaintiff Grass and Class members known the truth they would not have purchased the Meat Products or paid as much for them.

9.       For example, Whole Foods' 5-Step® Rating System proclaims that "NO CAGES" are permitted for poultry certified under Step 1. But the standard practice in the industry is not to raise broiler chickens (as opposed to egg-laying chickens) in cages in the first place. So the assertion of "NO CAGES" merely mimics the industry standard, providing only the illusion of improvement to animal welfare.

10.     Whole Foods' conduct described herein violates (i) California Business & Professions Code §§ 17200, *et seq.* (the Unfair Competition Law or "UCL"); (ii) California Civil Code §§ 1750, *et seq.* (the Consumers Legal Remedies Act or "CLRA"); and (iii) California Business & Professions Code §§ 17500, *et seq.* (the False Advertising Law or "FAL"). Plaintiff Grass brings this action on behalf of a California Class for restitution and injunctive relief, and any other relief deemed appropriate by the Court to which this case is assigned.

## II.     PARTIES

11.     People for the Ethical Treatment of Animals, Inc. ("PETA") is an international animal protection organization. PETA is organized as a nonprofit corporation and charity pursuant to section 501(c)(3) of the Internal Revenue Code, with its headquarters in Norfolk, Virginia, and offices in Los Angeles, California. PETA's mission focuses on improving and educating the public about animal use in

- 3 -

four main areas, including animals raised for food.  It brings this case on its own behalf for injunctive relief to protect its organizational interests and resources.

12.     PETA has suffered a diversion of its resources and a frustration of its mission as a result of Defendants' continuing misconduct.  As part of its organizational activities, PETA has been and will continue to be required to incur costs and divert resources educating the public about the inadequacy of Defendants' standards to ensure improved conditions for the animals whose meat is sold by Defendants, including informing the public that notwithstanding Defendants' representations, many of their key certification standards barely exceed common industry practices, if at all, and that the animals may still have been held in intensive confinement in unnatural conditions, or otherwise treated consistent with, and no better than, industry standards.  PETA has also been and will continue to be required to spend resources to urge Whole Foods to stop its misleading advertising.  PETA has been and will continue to be required to expend these resources as a direct result of Whole Foods' unlawful misrepresentations.

13.     PETA's injuries are likely to be redressed if Whole Foods ceases its misleading advertising.  PETA will no longer have to expend resources educating the public about the inadequacy of Defendants' standards, because Defendants would no longer be misrepresenting to consumers that the animals are being treated more humanely by virtue of their rating on Whole Foods' 5-Step® Rating System. These resources could then be directed to other PETA projects in furtherance of its overall mission.

14.     Plaintiff Lori Grass is a citizen of the State of California, residing in Portola Valley.  Plaintiff Grass has purchased Meat Products from Defendants' retail store located in Mountain View and Redwood City, California, regularly over the last four years preceding the filing of the complaint.  Plaintiff Grass saw the advertising signs, placards, and/or napkins described herein in the retail stores where she purchased the Meat Products.  Although Plaintiff Grass does not recall the

- 4 -

specifics of the many advertisements she saw before she purchased the Meat Products, she does recall that superior animal welfare was a consistent theme across the advertisements she saw.  These representations about superior animal welfare influenced her decision to purchase Meat Products.  Plaintiff would not have purchased them or paid as much had these advertisements disclosed the truth.  Plaintiff Grass seeks restitution and injunctive relief requiring Whole Foods to cease its deceptive advertising.

15.     Defendant Whole Foods Market Services, Inc. is a wholly owned subsidiary of Whole Foods Market, Inc.  Whole Foods Market Services, Inc. handles corporate services for Defendants Whole Foods Market California, Inc. and Mrs. Gooch's Natural Food Markets, Inc., including marketing and advertising.  It is incorporated in Delaware with its principal place of business in Austin, Texas.

16.     Defendant Whole Foods Market California, Inc. is a wholly owned subsidiary of Whole Foods Market, Inc.  Whole Foods Market California, Inc. is a natural and organic food retailer.  It is incorporated in California with its principal place of business in Austin, Texas.

17.     Defendant Mrs. Gooch's Natural Food Markets, Inc. is a wholly owned subsidiary of Whole Foods Market, Inc.  Mrs. Gooch's Natural Food Markets, Inc. is a natural and organic food retailer.  It is is incorporated in California with its principal place of business in Austin, Texas.

### III.     JURISDICTION AND VENUE

18.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000, and the Class includes members who are citizens of a different state than a Defendant.

19.     This Court has personal jurisdiction over Defendants Whole Foods because it has regional offices and conducts substantial business in this district and throughout the State of California.

- 5 -

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants has marketed and sold Meat Products within this district, and a substantial number of the acts and omissions alleged herein occurred within this district.

## IV.    FACTUAL ALLEGATIONS

**A.     Whole Foods Uses GAP's 5-Step® Rating System to Advertise Its Meat Products.**

21.     Whole Foods markets and sells its Meat Products in retail stores with advertising emphasizing GAP's 5-Step® Rating System.

22.     In or around late 2008, Whole Foods provided the initial funding to form GAP.  GAP is nominally a separate 501(c)(3) entity, self-described as "a non-profit alliance of producers, retailers, animal advocates and scientists dedicated to improving farm animal welfare,…committed to informing and empowering consumers and recognizing and rewarding farmers and ranchers for raising their animals in a welfare-friendly way."[2]  But GAP continues to receive the majority of its funding from Whole Foods.[3]  And GAP board members include current and former executives of Whole Foods.[4]

23.     In 2009, Whole Foods began rolling out GAP ratings on its Meat Products in its retail stores.  By February 2011, Whole Foods launched GAP's 5-Step® Rating System across the United States with a fully developed six-tier scale

---

[2] Global Animal Partnership, *Welcome to the Global Animal Partnership*, http://www.globalanimalpartnership.org/ (last visited on July 15, 2015).

[3] Animal Charity Evaluators, *Global Animal Partnership*, http://www.animalcharityevaluators.org/research/organizations/global-animal-partnership/ (last visited on July 15, 2015).

[4] GAP board member Edmund La Macchia is currently Global Vice President of Procurement – Perishables at Whole Foods. *See* Global Animal Partnership. *Meet The Team*. http://www.globalanimalpartnership.org/about/team (last visited on July 15. 2015). GAP board member Anne Malleau was employed at Whole Foods from 2003 to 2011 and was Global Animal Production and Welfare Coordinator. *See* Whole Foods Market. *Anne Malleau*. http://www.wholefoodsmarket.com/person/anne-malleau (last visited on July 15, 2015).

THIRD AMENDED COMPLAINT
010529-11  851056 V2

for animal welfare ranging from one ("1") to five plus ("5+").[5]  The GAP on-farm standards are species-specific for chicken,[6] turkey,[7] pork,[8] and beef suppliers.[9]  On its website, Whole Foods asserts that it places "a strong focus on animal welfare with standards for all species of animals raised for our meat department."[10]

24.     Under the Whole Foods 5-Step® Rating System, all farmers and ranchers supplying chicken, turkey, pork, and beef must at least satisfy Step 1, which the company describes as "a clear departure from conventional animal agricultural practices."[11]

25.     To convey this core message to consumers, Whole Foods inundates them with the signs, placards, and napkins depicted below, such that consumers are left with the unmistakable message that Whole Foods' standards ensure a level of

---

[5]  Whole Foods Market, Whole Foods Market, 2013 Annual Report, at 3 (2013) https://www.wholefoodsmarket.com/sites/default/files/media/Global/Company%20Info/PDFs/WFM-2013-Annual-Stakeholders-Report.pdf

[6]  GAP, *5-Step Animal Welfare Rating Standards for Chickens Raised for Meat*, http://glblanimalpartnership.blob.core.windows.net/standards/Chicken%20Welfare%20Standards.pdf (last visited July 7, 2015).

[7]  GAP, *5-StepTM Animal Welfare Rating Pilot Standards for Turkeys*, http://glblanimalpartnership.blob.core.windows.net/standards/Turkey%20Welfare%20Standards%20V1.1.pdf (last visited July 7, 2015).

[8]  GAP, *5-Step® Animal Welfare Rating Standards for Pigs v. 2.0,* http://glblanimalpartnership.blob.core.windows.net/standards/Pig%20Welfare%20Standards%20V2.0.pdf (last visited July 7, 2014).

[9]  GAP, *5-Step® Animal Welfare Rating Standards for Beef Cattle,* http://glblanimalpartnership.blob.core.windows.net/standards/Beef%20Cattle%20Welfare%20Standards.pdf (last visited July 8, 2014).

[10]  Whole Foods Market, *Animal Welfare Basics,* http://www.wholefoodsmarket.com/mission-values/animal-welfare/animal-welfare-basics (last visited July 10, 2015).

[11]  http://www.wholefoodsmarket.com/blog/animal-welfare-and-our-meat-department; *see also* BloombergBusiness, *Whole Foods May Not Be the Pig Paradise You Think It Is*, http://www.bloomberg.com/news/articles/2015-09-17/whole-foods-might-not-be-the-pig-paradise-you-think-it-is (last visited Sept. 17, 2015).

humane treatment, and therefore quality, from its meat suppliers that exceeds normal industry practices.

26.    Throughout the class period, as consumers approach the meat section of each Whole Foods' retail store, they will see one of a variety of similar, large signs advertising Whole Foods Meat Products with its 5-Step® Rating System along with promotional slogans and imagery:





THIRD AMENDED COMPLAINT
010529-11  851056 V2

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18
19
20
21
22
23



24      27.     These are not federally reviewed labels but independent advertising

25  signs made by Whole Foods promoting its fresh meats in general.

26
27
28

- 9 -

1

2

3

4

5

6

7

8

9

10

11

28.     Consumers will also see the 5-Step® Rating system similarly advertised on colorful placards (including black, white, orange, yellow, and green) lining the refrigerated meat cases:





12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



THIRD AMENDED COMPLAINT
010529-11  851056 V2

29.    These are not federally reviewed labels but independent advertising placards made by Whole Foods promoting its fresh meats in general.

30.    And consumers will see the 5-Step® Rating Chart similarly advertised on napkins found all over the prepared foods sections of Whole Foods' retail stores:



31.    These are not federally reviewed labels but independent advertising napkins made by Whole Foods promoting its fresh meats in general.

32.    Moreover, as depicted above and below, Whole Foods explicitly advertises the connection between the treatment and health of the animals used to supply its Meat Products and the quality of its Meat Products on signs with promotional slogans such as "great tasting meat from healthy animals" and "raised right tastes right."

THIRD AMENDED COMPLAINT
010529-11 851056 V2

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25    33.    These are not federally reviewed labels but independent advertising

26  signs made by Whole Foods promoting its fresh meats in general.

27
28

- 12 -

34.     Whole Foods inundates consumers with the signs, placards, and napkins depicted herein, and has done so throughout the class period, including in the store where Plaintiff Grass shopped on a regular basis.  Therefore, she, like other class members, was saturated over a period of years with the cumulative message of ensuring improved animal treatment intended by Whole Foods.  Advertising signs, placards, and napkins have been ongoing in all Whole Foods stores during the last four years and Plaintiff Grass was exposed to them during the entire time she shopped there, which was throughout the four-year class period.[12]

35.     The advertisements described above and below are not reproductions of the suppliers' labels; they are independent signs, placards, and napkins made by Whole Foods promoting its fresh meats in general.  These advertisements do not identify or accompany any particular product.  In addition, the United States Department of Agriculture's Food Safety and Inspection Service (FSIS) does not require point-of-purchase materials to receive prior approval unless they are shipped with the product.  Claims based on the advertisements depicted herein are not preempted.

---

[12] *2011 Annual Stakeholder Report* at p. 5 ("Global Animal Partnership's 5-Step Animal Welfare Rating standards have been developed for beef cattle, pigs and broiler chickens….As of February 2011, our meat departments in all U.S. stores reflect these certifications."), available at http://www.wholefoodsmarket.com/sites/default/files/media/Global/Company%20Info/PDFs/ar11.pdf; *2012 Annual Stakeholder Report* at p. 3 ("As of 2011, our meat departments in all U.S. stores reflect these certifications."), available at http://www.wholefoodsmarket.com/sites/default/files/media/Global/Company%20Info/PDFs/2012-WFM_Annual_Report.pdf; *2013 Annual Stakeholder Report* at p. 3 ("The 5-Step program launched in 2011 and is currently reflected in meat departments in all of our stores in the U.S."), available at http://www.wholefoodsmarket.com/sites/default/files/media/Global/Company%20Info/PDFs/WFM-2013-Annual-Stakeholders-Report.pdf; *2014 Annual Stakeholder Report* at p. 4 ("Global Animal Partnership's 5-Step® Animal Welfare Rating Standards program is currently in all of our stores in the U.S."), available at http://assets.wholefoodsmarket.com/www/company-info/investor-relations/annual-reports/2014-WFM_Annual_Report.pdf; *2015 Annual Stakeholder Report* at p. 4 (same), available at http://assets.wholefoodsmarket.com/www/company-info/investor-relations/annual-reports/2015-WFM-Annual-Report.pdf.

**B.    Whole Foods Advertises With the 5-Step® Rating System to Extract a Price Premium from Consumers.**

36.    Academic surveys,[13] as well as those from Gallup[14] and Consumer Reports,[15] consistently demonstrate that consumers have become increasingly interested in farm animal welfare.  Likewise, consumers have become increasingly concerned about the quality of the meat they consume.

37.    Whole Foods has responded by positioning itself as a seller of superior quality Meat Products.  As part of its Animal Welfare Basics description, Whole Foods' website notes that "[b]efore we do any purchasing, we know exactly how the animal was raised, what it ate and where it came from.  And, we've done the research to give you the most responsibly raised selection of meat and poultry around."[16]  Moreover, Whole Foods adds, "[f]rom basic principles of production to food safety audits, we hold our meat producers to a higher standard – championing innovative production systems that ensure the quality and the safety of the meat we sell."[17]

---

[13] Grimshaw K. et al., *Consumer Perception of Beef, Pork, Lamb, Chicken, and Fish, Meat Science*, Vol. 96 (Jan. 2014), pp. 443-444.

[14] Rebecca Riffkin, *In. U.S., More Say Animals Should Have Same Rights as People*, http://www.gallup.com/poll/183275/say-animals-rights-people.aspx (last visited July 10, 2015) (find that 54% of Americans surveyed were at least somewhat concerned with the treatment of animals raised for food).

[15] Consumer Reports® National Research Center, Food Labels Survey (2014 Nationally-Representative Phone Survey), http://www.greenerchoices.org/pdf/ConsumerReportsFoodLabelingSurveyJune2014.pdf (last visited July 10, 2015) (reporting that 80% of surveyed consumers were interested in good living conditions for animals).

[16] *See* Whole Foods Market, *Animal Welfare Basics,* http://www.wholefoodsmarket.com/mission-values/animal-welfare/animal-welfare-basics (last visited July 10, 2015).

[17] *Id.  See also* Whole Foods Market, 2013 Annual Report, at 3 (2013) (describing business as "dedicated to promoting animal welfare on farms and ranches…[and] encourage[ing] innovative animal production practices that improve the lives of animals raised for meat and poultry in our stores"), https://www.wholefoodsmarket.

- 14 -

38.     Indeed, consumers are willing to pay an additional premium for meat from animals raised under humane conditions.  A 2010 phone survey conducted by economists at Oklahoma State University concluded that "the majority of respondents consider animal well-being to be more important than low meat prices. This suggests consumers are willing to pay higher food prices if they believe doing so would ensure greater animal well-being."[18]  And in a 2012 online survey conducted by Harris Interactive on behalf of Whole Foods, 24% of responded indicated that they are willing to pay more for meats raised under humane animal treatment standards.[19]

39.     The 5-Step® Rating System is the cornerstone of Whole Foods' effort to capitalize on consumer demand for humanely treated animal products.  On its website, Whole Foods describes the 5-Step® Rating System as "[y]our way of knowing how the animals were raised for the meat you are buying."[20]

40.     As a result of being inundated with the signs, placards, and napkins depicted above consumers are left with the unmistakable message that Whole Foods' standards ensure a level of humane treatment (and therefore quality) from its meat suppliers that exceeds normal industry practices.  The 5-Step® Rating System thus allows Whole Foods to charge consumers more for its meat products.

---

com/sites/default/files/media/Global/Company%20Info/PDFs/WFM-2013-Annual-Stakeholders-Report.pdf.

[18] RW Pricket, F. Bailey Norwood, and JL Lusk, *Consumer Preferences for Farm Animal Welfare: Results from a Telephone Survey of US Households,* 19 Animal Welfare 335, 340 (2010), http://asp.okstate.edu/baileynorwood/misc1/Mexico/Prickett.pdf (last visited July 10, 2015).

[19] PR Newswire, http://www.prnewswire.com/news-releases/survey-shows-majority-of-americans-are-value-seekers-but-refuse-to-swap-quality-for-low-prices-171537031.html (last visited July 9, 2015).

[20] Whole Foods Markets, *5-Step® Animal Welfare Rating*, http://www.wholefoodsmarket.com/mission-values/animal-welfare/5-step-animal-welfare-rating.

- 15 -

1   41.    For example, Step 3-rated chicken breast is $7.99 per pound at Whole

2   Foods, considerably more than the $2.99 and $3.99 charged at Vons and Ralphs

3   respectively.  Likewise, Step 4-rated beef rib eye is $18.99 per pound at Whole

4   Foods, compared with $12.99 at these other markets.  And Step 1-rated pork ribs are

5   $7.99 at Whole Foods, while only $3.99 and $4.99 at Vons and Ralphs respectively.

6   **C.    The GAP Audit Process Does Not Ensure Compliance with its Standards.**

7   42.    GAP's audit process is so lax that it does not actually ensure compliance

8   with the 5-Step® Rating System.  The GAP audit process permits nonconformance

9   to go unmonitored and unmitigated for such great lengths of time that the whole 5-

10  Step® Rating System amounts to nothing more than a sham to deceive consumers

11  into paying a premium for unverified claims of superior animal treatment.  Consu-

12  mers would not pay a premium if they knew that the audit process was illusory.[21]

13  43.    First, GAP only requires suppliers to have a scheduled audit once every

14  fifteen months.[22]  For broiler chicken suppliers, for example, this means that the vast

15  majority of flocks are never inspected because chickens are generally slaughtered at

16  seven or eight weeks old.  For all suppliers, this means that their day in and day out

17  treatment of chickens, pigs, and cows is not monitored by the GAP auditors.  The

18  audits are neither a surprise nor frequent – as one might expect if there was a serious

19  commitment to ensure compliance.  Rather, inspections are pre-announced and occur

20  at long intervals of over a year.

21  44.    For example, PETA recently conducted an eyewitness investigation at a

22  Step-2 certified pig farm, which revealed a manager hitting pigs who were being

23

24  [21] Although the 73-page GAP Audit Manual is made available on Whole Foods'
    website, consumers at the retail store cannot reasonably be expected to have
25  examined its contents prior to purchasing Meat Products.

26  [22] Global Animal Partnership, *Pilot GAP Policy Manual v1.0*,
    https://glblanimalpartnership.blob.core.windows.net/other/GAP%20Policy%20Manu
27  al.pdf ("GAP Audit Manual") at 5, 12-13 (last visited July 7, 2015).

28

THIRD AMENDED COMPLAINT
010529-11  851056 V2

loaded for slaughter with a hard plastic sorting panel.  GAP does not permit pigs to be hit during loading at any Step.  Violation of this standard is a major non-conformance.  But such violations are unlikely ever to be caught when inspections occur with advance notice and are exceedingly infrequent.

45.     Second, GAP designates violations of most standards as "minor" so that they can be violated over and over again without repercussions.  In the event of a so-called "minor" non-conformance, a supplier may be cited but will not lose certification.[23]  If the same "minor" non-conformance is identified in the next audit, the non-conformance becomes a major non-conformance, but the supplier still does not lose its GAP certification.[24]  Only if the non-conformance remains after a *third* audit will the supplier lose its GAP certification.[25]  So a supplier will not lose certification for a "minor" non-conformance for a full ***3 years and 9 months*** after the non-conformance was first identified.

46.     And during this time Wholes Foods can continue to market and sell Meat Products from such a non-conforming supplier at a premium price because the supplier is still GAP certified.[26]  Reasonable consumers would not pay a premium for a Meat Product requiring compliance with certain standards if they knew that a supplier would have to be out-of-compliance for almost 4 years before its products would be removed from the shelves.

47.     Similarly, for so-called major non-conformances, only after an audit identifies the same major non-conformance twice will a supplier lose its GAP

---

[23] *Id.* at 32-33.

[24] *Id.*

[25] *Id.*

[26] *See* Global Animal Partnership, *Pilot GAP Policy Manual v1.0*, https://glblanimalpartnership.blob.core.windows.net/other/GAP%20Policy%20Manual.pdf ("GAP Audit Manual") at 32-33 (last visited July 7, 2015).

- 17 -

rating.[27]  But, then again, the same major non-conformance may be overlooked.  As the GAP Audit Manual explains, "[i]f an Operation receives the same non-conformance [as] in a previous audit but efforts to address that non-conformance have been made then, at the Certifiers discretion, it may not be considered a repeat non-conformance" and the supplier will still be re-certified.[28]  This means that Whole Foods can advertise and sell Meat Products from a supplier with a major non-conformance for 2 years and 6 months – or even much longer – before a supplier will lose its certification.

48.     Accordingly, the audit process does not provide for meaningful compliance with GAP standards.  Reasonable consumers would not pay a premium for a Meat Product requiring compliance with certain standards if they knew that a supplier would have to be out-of-compliance for multiple years before its products would be removed from the shelves.

**D.     Key Standards in the 5-Step® Rating System Fail to Ensure a Significant Improvement In Animal Welfare Over Standard Industry Practice.**

49.     Because key standards of the 5-Step® Rating System barely exceed common industry practices, if at all, advertising such standards creates a false impression of improving animal treatment and delivering a superior quality product.

**1.     Chickens and Turkeys**

50.     It is well documented that overcrowding causes significant stress and illness in chickens and turkeys.[29]  And consumers perceive overcrowding to be a highly significant factor in determining animal welfare.[30]

---

[27] Global Animal Partnership, *Pilot GAP Policy Manual v1.0*, https://glblanimalpartnership.blob.core.windows.net/other/GAP%20Policy%20Manual.pdf ("GAP Audit Manual") at 32-33 (last visited July 7, 2015).

[28] *Id.* at 32.

[29] *See, e.g.,* V. Tsiouris et al., *High Stocking Density as a Predisposing Factor for Necrotic Enteritis in Broiler Chicks*, 44 Avian Pathology 59 (2015); A. Meluzzi et al.

- 18 -

THIRD AMENDED COMPLAINT
010529-11  851056 V2

51.     As depicted above and below, Whole Foods' 5-Step® Rating System proudly advertises that "NO CAGES, NO CRATES, NO CROWDING" is permitted for poultry certified under Step 1.



52.     But the standard practice in the poultry industry is not to raise broiler chickens (as opposed to egg-laying chickens) or turkeys in cages in the first place.[31] So the advertising assertion of "NO CAGES" merely mimics the industry standard,

*Effect of Less Intensive Rearing Conditions on Litter Characteristics, Growth Performance, Carcase Injuries and Meat Quality of Broilers*, 49 Brit. Poultry Sci. 509 (2008); I. Estevez, *Density Allowances for Broilers: Where to Set the Limits?* 86 Poultry Sci. 1265, 1269 (2007); A.V.S. Gomes et al., *Overcrowding Stress Decreases Macrophage Activity and Increases Salmonella Enteritidis Invasion in Broiler Chickens*, 43 Avian Pathology 82 (2014); J. De Jonge & H. Van Trijp, *The Impact of Broiler Production System Practices On Consumer Perceptions of Animal Welfare*, 92 Poulty Sci. 3080, 3082 (2013).

[30] RW Pricket, F. Bailey Norwood, and JL Lusk, *Consumer Preferences for Farm Animal Welfare: Results from a Telephone Survey of US Households,* 19 Animal Welfare 335, 335-36 (2010), http://asp.okstate.edu/baileynorwood/misc1/Mexico/Prickett.pdf (last visited July 10, 2015).

[31] *See, e.g.*, National Chicken Council, *Animal Welfare for Boiler Chickens*, http://www.nationalchickencouncil.org/industry-issues/animal-welfare-for-broiler-chickens/ (last visited July 10, 2015); EPA, Poultry Production Phases, http://www.epa.gov/oecaagct/ag101/poultryphases.html (last visited July 10, 2015).

- 19 -

THIRD AMENDED COMPLAINT
010529-11  851056 V2

providing only the illusion of improvement to animal welfare.  Accordingly, Whole Foods misleads consumers into believing that their broiler chickens and turkeys are raised in better conditions than they otherwise would be.

53.    Moreover, Whole Foods' advertising of "NO CAGES, NO CROWD-ING" misleads consumers into believing that the absence of cages necessarily translates into environments whereby broiler chickens and turkeys are free from overcrowding and enjoy healthier environments.  Unfortunately this is untrue.  In contrast to the image above, birds raised by Step 1 and 2-certified suppliers can be crowded into sheds at nearly the same density that is standard on factory farms.

54.    According to GAP, at Step 1, a farm must only provide one square foot of space for every 7 pounds of broiler chicken.  At Step 2, broiler chickens can be housed at 6.5 pounds per square foot.[32]  Neither is materially better than the industry standard rate of 7.5 pounds per square foot.[33]

55.    Similarly for turkeys, at Step 1, GAP only requires one square foot for every 10 pounds.  At Step 2, GAP only requires one square foot for every 7.5 pounds.[34]  This is worse than the industry standard of 2.25 square feet for a 16-pound hen (one square foot for every 7.1 pounds), and a minute improvement compared to

---

[32] Global Animal Partnership, *5-Step Animal Welfare Rating Standards for Chickens Raised for Meat*, http://glblanimalpartnership.blob.core.windows.net/standards/Chicken%20Welfare%20Standards.pdf at 15 (last visited July 7, 2015) (noting average weight of 5.5 pounds for chickens).

[33] National Chicken Council, *National Chicken Council Animal Welfare Guidelines and Audit Checklists for Broilers*, http://www.nationalchickencouncil.org/wp-content/uploads/2014/04/NCC-Guidelines-Broilers-April2014.pdf at 9 (last visited July 7, 2015).

[34] Global Animal Partnership, *5-StepTM Animal Welfare Rating Standards for Turkeys* v2.0 http://glblanimalpartnership.blob.core.windows.net/standards/Turkey%20Welfare%20Standards%20V2.0.pdf at 19 (last visited July 28, 2015).

the recommended 3.5 square feet for a 40-pound tom (one square foot for every 11.4 pounds).[35]

56.     With such typical crowded conditions, it is no surprise that a key standard such as the premature death rate permitted by Whole Foods' standards is no improvement over industry practice.  Whole Foods permits a 0.5% *daily* mortality rate for the flocks used to supply its stores,[36] which exceeds the 0.6% *weekly* industry average.[37]  Thus, consumers paying a premium for standards requiring superior treat-ment and chicken from birds of superior health are not getting what they paid for.  Indeed, standards with respect to body condition and premature mortality rates reflect the overall health of animals and the quality of their meat, and as such are key standards of an animal welfare program.

**2.     Pigs**

57.     Whole Foods advertises "NO CRATES, NO CROWDING" starting at Step 1, yet its 5-Step® Rating System still permits the crowding of pigs, contrary to the impression created by is advertising.  For example, PETA's recent eyewitness investigation of the pig farm revealed that the pigs spent almost all their time crammed into crowded indoor sheds, as permitted by Steps 1 and 2.  Due to the crowding, agitated and frustrated pigs fought and bit each other's tails, sometimes causing bloody wounds.  As reported by Bloomberg Business in an article entitled

---

[35] Sandra G. Velleman & Nicholas B. Anthony, *The Impact of Stocking Density on Growth and Yield of Commercial Pheasants*, Midwest Poultry Consortium, http://www.mwpoultry.org/ProjectPDFs/07-15.pdf at 2 (last visited July 7, 2015).

[36] Global Animal Partnership, *5-Step Animal Welfare Rating Standards for Chickens Raised for Meat*, http://glblanimalpartnership.blob.core.windows.net/standards/Chicken%20Welfare%20Standards.pdf] at 12. (last visited July 7, 2015).

[37] National Chicken Council, *U.S. Broiler Performance*, http://www.nationalchickencouncil.org/about-the-industry/statistics/u-s-broiler-performance/ (last visited July 21, 2015) (3.9% total mortality for broilers living approximately seven weeks).

*Whole Foods Might Not Be the Pig Paradise You Think It Is*, "[l]arge pigs are shown crowded into pens with little room to roam."[38]  That such crowding is permitted by the 5-Step® Rating System renders Whole Foods' representation to the contrary false and misleading.

58.   Another key standard for pigs relates to their body condition, which is one of the most informative measures of the overall health of a pig.  Body condition is a critical factor affecting health, welfare, productivity and longevity.  Body condition is rated by the industry on a scale of one to five, with three considered "optimum."[39]  Moreover, the recommended industry aim is "an optimal average condition score of 3" throughout the herd.[40]  GAP suppliers, however, are only required to have pigs with a body condition score of two for all steps on the 5-Step® Rating System.[41]  But a score of two reflects a pig that is sub-optimally "thin."

59.   A reasonable consumer who paid a premium for a GAP certified product would not expect that it came from pigs required to have no more than a sub-optimal body condition *below* the industry's own target.

---

[38] http://www.bloomberg.com/news/articles/2015-09-17/whole-foods-might-not-be-the-pig-paradise-you-think-it-is.

[39] C. Johnson et al., Sow Condition Scoring Guidelines, National Hog Farmer (Apr. 15, 2006), http://nationalhogfarmer.com/mag/farming_sow_condition_scoring; The Pig Site, *Condition Scoring of Sows*, http://www.thepigsite.com/articles/2647/condition-scoring-of-sows/ (last visited July 9, 2015).

[40] *Id.*

[41] Global Animal Partnership, *5-Step® Animal Welfare Rating Standards for Pigs v. 2.1* at 12, http://glblanimalpartnership.blob.core.windows.net/standards/Pig%20Welfare%20Standards%20V2.1.pdf (last visited July 28, 2015); Global Animal Partnership, *5-Step® Animal Welfare Rating Standards for Pigs v. 2.0*, http://glblanimalpartnership.blob.core.windows.net/standards/Pig%20Welfare%20Standards%20V2.0.pdf at 12 (last visited July 7, 2014).

THIRD AMENDED COMPLAINT
010529-11 851056 V2

60.     Lameness is also a key welfare issue affecting pigs.  A lame pig can experience significant chronic pain from arthritis, broken bones or leg weakness. Lameness often causes hunger as pigs are unable to move towards feeding troughs. Under GAP, up to 5% of a herd may be considered lame and still qualify under Step 1.  Up to 4% of a herd may be considered lame and still qualify under Step 2.  Up to 3% of a herd may be considered lame and still qualify under Step 3.  Up to 2% of a herd may be considered lame and still qualify under Step 4.  And up to 1% of a herd maybe considered lame and still qualify under Step 5.[42]

61.     But lameness of 1% to 5% is the typical range.[43]  And when more than 2% of pigs are recorded lame per month, the industry deems further investigation of the herd necessary to determine the cause of lameness throughout the herd and what steps should be taken to address the issue.[44]  Whole Foods, however, does not require investigation of greater than 2% lameness at Steps 1 through 3, again worse than industry practice.

62.     And, as with chickens, premature mortality rates are a key indicator of animal health.  High mortality rates in piglets are a sign of poor herd welfare.[45]  Yet while "[t]he pork industry has averaged 8-15% preweaning mortality for many

---

[42] Global Animal Partnership, *5-Step® Animal Welfare Rating Standards for Pigs v. 2.1* at 16, http://glblanimalpartnership.blob.core.windows.net/standards /Pig%20Welfare%20Standards%20V2.1.pdf (last visited July 28, 2015); Global Animal Partnership, *5-Step® Animal Welfare Rating Standards for Pigs v. 2.0,* http://glblanimalpartnership.blob.core.windows.net/standards/Pig%20Welfare%20St andards%20V2.0.pdf at 16 (last visited July 7, 2014).

[43] The Pig Site, *The PigSite Pig Health,* http://www.thepigsite.com/pighealth/article/333/lameness/; *see also The PigSite Quick Disease Guide,* http://www.thepigsite.com/diseaseinfo/57/lameness/.

[44] *Id.*

[45] *See, e.g.,* A. Kilbride et al., *Risks Associated with Preweaning Mortality in 855 Litters on 39 Commercial Outdoor Pig Farms in England*, 117 Preventive Veterinary Med. 189 (2014).

years,"[46] at all steps, GAP will certify herds with a pre-weaning mortality average of up to 15% of piglets.[47]  In short, even Whole Foods' most premium pork products are permitted to come from herds with piglet mortality rates at the absolute bottom of average.  This is particularly unimpressive considering that many farms target piglet mortality rates that are nearly half of what GAP certification requires.[48]

63.     Similarly, the Pork Industry Handbook Fact Sheet identifies a mortality rate between 2-5% for breeding sows as "Good."  Less than 2% has been categorized as "Excellent."[49]  But Whole Foods' does not require excellence from its suppliers.  At all steps, GAP will certify herds with a mortality average of up to 3% of the breeding herd.[50]

64.     As with chickens, consumers paying a premium for standards requiring pigs from herds of superior health and quality are not getting what they paid for.

---

[46] Jon Vansickle, *Tracking Newborn Pig Death Losses*, National Hog Farmer, http://nationalhogfarmer.com/mag/farming_tracking_newborn_pig.

[47] Global Animal Partnership, *5-Step® Animal Welfare Rating Standards for Pigs v. 2.1* at 16, http://glblanimalpartnership.blob.core.windows.net/standards/Pig%20Welfare%20St andards%20V2.1.pdf (last visited July 28, 2015); Global Animal Partnership, *5-Step®  Animal Welfare Rating Standards for Pigs v. 2.0,* http://glblanimalpartnership.blob.core.windows.net/standards/Pig%20Welfare%20St andards%20V2.0.pdf at 16 (last visited July 7, 2014).

[48] Jon Vansickle, *Tracking Newborn Pig Death Losses*, National Hog Farmer, http://nationalhogfarmer.com/mag/farming_tracking_newborn_pig.

[49] Allen F. Harper, Mark J. Estienne, *Composting for Mortality Disposal on Hog Farms*, https://pubs.ext.vt.edu/414/414-020/414-020.html (last visited July 10, 2015).

[50] Global Animal Partnership, *5-Step® Animal Welfare Rating Standards for Pigs v. 2.1* at 16, http://glblanimalpartnership.blob.core.windows.net/standards/Pig%20Welfare%20St andards%20V2.1.pdf (last visited July 28, 2015); Global Animal Partnership, *5-Step®  Animal Welfare Rating Standards for Pigs v. 2.0,* http://glblanimalpartnership.blob.core.windows.net/standards/Pig%20Welfare%20St andards%20V2.0.pdf at 16 (last visited July 7, 2014).

THIRD AMENDED COMPLAINT
010529-11 851056 V2

### 3.    Cattle

65.    A key standard for cattle relates to their body condition, which is one of the most informative measures of their overall health.  It is industry practice to assess the health and welfare of cattle by using body condition scores ("BCS") ranging from one to nine.  A cow in 'thin' condition (BCS 1-4) is angular and bony with minimal fat over the backbone, ribs, hooks, and pins.  There is no visible fat around the tail head or brisket.  A cow in 'ideal' condition (BCS 5-7) has a good overall appearance.  An over-conditioned cow (BCS 8-9) is smooth and boxy with bone structure hidden from sight or touch.[51]

66.    Reasonable consumers would believe that meat for which they are pay a premium must come from animals in "ideal" condition.  They would be mistaken.  A body condition score of 4 (considered "borderline" by the industry[52]) suffices for all steps.[53]

67.    Another key standard for cattle is lameness, which is rare in healthy herds and an obvious clinical symptom of impaired animal welfare.  According to a Kansas State University study, 3,243 beef cattle between 400 to 700 lbs. in one Kansas feed yard had incidence of lameness of 1.6% at the time of pre-processing and 2.5% up to 40 days after processing.[54]  Similarly, a review of five large western

---

[51] Dan E. Eversole et al., Virginia Cooperative Extension, Body Condition Scoring Beef Cows, https://pubs.ext.vt.edu/400/400-795/400-795_pdf.pdf.

[52] *Id.* at 3.

[53] Global Animal Partnership, *5-Step® Animal Welfare Rating Standards for Beef Cattle* at 7-8, http://glblanimalpartnership.blob.core.windows.net/standards/Beef%20Cattle%20Welfare%20Standards.pdf (last visited July 8, 2014).

[54] Green, T. M., Thompson, D. U., Wileman, B. W., Guichon, P. T. and Reinhardt, C. D. 2012. *Time of Onset, Location and Duration of Lameness in Beef Cattle in a Commercial Feedyard*, Kansas State University Cattlemen's Day 2012, pages 21-24. http://hdl.handle.net/2097/13556

THIRD AMENDED COMPLAINT
010529-11  851056 V2

feedlots by Dr. Dee Griffin of the University of Nebraska-Lincoln, cited by the National Cattlemen's Beef Association, observed a lameness incidence of 2.1%.[55]

68.     Compared to this, the 5-Step® Animal Rating standards are no improvement over the industry standard.  GAP certification requires that "lameness levels not exceed 2% of the herd at any one time."[56]

69.     As with chickens and pigs, consumers paying a premium for standards requiring beef from cattle herds of superior health and quality are not getting what they paid for.

## V.     CLASS ACTION ALLEGATIONS

70.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Grass seeks certification of a Class defined as follows:

> All consumers who purchased Meat Products at a Whole Foods retail store in California during the four years prior to the filing of the complaint.

71.     Excluded from the Class are Defendants; the officers, directors or employees of Defendants; any entity in which Defendants has a controlling interest; and any affiliate, legal representative, heir or assign of Defendants.  Also, excluded from the Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

72.     Plaintiff Grass does not know the exact number of Class members at the present time.  However, due to the nature of the trade and commerce involved, there appear to be thousands of Class members such that joinder of all Class members is impracticable.

---

[55] Dee Griffin, Lameness,  89(last visited July 10, 2015).

[56] Global Animal Partnership, *5-Step®  Animal Welfare Rating Standards for Beef Cattle* at 8, http://glblanimalpartnership.blob.core.windows.net/standards/Beef%20Cattle%20Welfare%20Standards.pdf (last visited July 8, 2014).

THIRD AMENDED COMPLAINT
010529-11  851056 V2

73.     The Class is ascertainable by objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other consumer fraud cases and complex class actions, and through Whole Foods' business records.

74.     There are questions of law and fact common to the Class.  Defendants' unlawful omissions similarly impact Class members, all of who purchased one or more Meat Product.

75.     Plaintiff Grass asserts claims that are typical of the Class.  Plaintiff Grass and all Class members have been subjected to the same wrongful conduct because they all have purchased Whole Foods' Meat Products that were marketed and sold using the 5-Step® Rating System. As a result, and like other members of the Class, Plaintiff Grass purchased and paid an amount for Meat Products which they otherwise would not have paid.

76.     Plaintiff Grass will fairly and adequately represent and protect the interests of the Class.  Plaintiff Grass and the Class are represented by counsel competent and experienced in both consumer protection and class action litigation.

77.     Class certification is appropriate because Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

78.     Class certification is also appropriate because common questions of law and fact substantially predominate over any questions that may affect only individual members of the Class, including, *inter alia*, the following:

a.     Whether the audit process for the 5-Step® Rating System does not ensure compliance with its standards;

b.     Whether key animal welfare standards from Defendants' 5-Step® Rating System fail to ensure meaningful improvement over common industry practice;

c.     Whether Defendants failed to disclose in their advertising that the audit process for their 5-Step®

- 27 -

Rating System does not ensure compliance with its standards;

d.  Whether Defendants failed to disclose in their advertising that key animal welfare standards from its 5-Step® Rating System fail to ensure meaningful improvement over common industry practice;

e.  Whether Defendants had a duty to disclose that the audit process for their 5-Step® Rating System does not ensure compliance with their standards;

f.  Whether Defendants had a duty to disclose material facts regarding the 5-Step® Rating System's failure to ensure improved animal welfare compared to the industry standard;

g.  Whether Defendants' misrepresentations and/or nondisclosures would be material to a reasonable consumer;

h.  Whether Defendants' misrepresentations and/or nondisclosures were likely to deceive a reasonable consumer;

i.  Whether Defendants' conduct violates the UCL, FAL and CLRA;

j.  Whether the challenged practices harmed Plaintiff Grass and members of the Class; and

k.  Whether Plaintiff Grass and members of the Class are entitled to damages, restitution, equitable relief, and/or injunctive relief.

79.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable.  Furthermore, because the restitution and/or damages suffered, and continue to be suffered, by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous.

80.  The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications, which would establish

- 28 -

1 incompatible standards of conduct for Defendants.  In contrast, the conduct of this

2 action as a class action presents far fewer management difficulties, conserves judicial

3 resources and the parties' resources, and protects the rights of each Class member.

### VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200, *et seq.*)

81.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

82.    Plaintiff PETA brings this claim on behalf of itself and Plaintiff Grass brings this claim on behalf of herself and all Class members.

83.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practice."  Defendants have engaged in unlawful, and unfair, and fraudulent business acts and practices in violation of the UCL.

84.    Defendants have violated the unlawful prong by virtue of their violations of the CLRA, as described below.

85.    Whole Foods has violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint offend established public policy supporting truth in advertising to consumers.  Defendants' conduct is immoral, unethical, oppressive, unscrupulous, and injurious to consumers.  The harm that these acts and practices cause to consumers greatly outweighs any benefits associated with them.  Whole Foods' conduct also impairs competition within the market for meat products, and prevents Plaintiff Grass and Class members from making fully informed decisions about the kind of meat products to purchase or the price to pay for such products.

86.     Defendants have violated the fraudulent prong of section 17200 because their material misrepresentations and omissions were likely to deceive a reasonable consumer and the true facts would be material to a reasonable consumer.

87.     As alleged herein, Whole Foods' advertising for its Meat Products creates the impression of ensuring superior treatment for animals and therefore superior quality Meat Products.  Whole Foods failed to disclose in its advertisements for Meat Products that it does not ensure compliance with its animal welfare standards and that key animal welfare standards from its 5-Step® Rating System do not ensure meaningful improvement over common industry practice and/or standards.

88.     Whole Foods had a duty to disclose in its advertising for Meat Products that it does not ensure compliance with its animal welfare standards, arising from (1) its superior knowledge regarding the audit process, *e.g.* through its financial sponsorship of GAP and because at least two members of the GAP board of directors have been or are currently Whole Foods employees; and (2) its partial representations and/or misrepresentations to the contrary in its advertising, *i.e.*, that its Meat Products are certified by the Global Animal Partnership, creating the impression that the Meat Products are in compliance with those standards.

89.     Whole Foods had a duty to disclose in its advertising that key standards in the GAP 5-Step® Rating System fail to ensure improved animal welfare, arising from (1) its superior knowledge of prevailing industry standards as compared to the typical consumer, *e.g.* through its financial sponsorship of GAP and because at least two members of the GAP board of directors have been or are currently Whole Foods employees; and (2) its partial representations and/or misrepresentations to the contrary in its advertising, *i.e.* "no cages" for meat chickens implies that chickens raised for meat are usually kept in cages.

90.     Whole Foods' omissions are material, because reasonable consumers would consider the omitted facts, including the failure of key Whole Foods/GAP

- 30 -

1    standards to exceed industry norms and Whole Foods/GAP's illusory auditing

2    standards to be important in determining whether or not to purchase Meat Products.

3          91.    Reasonable consumers were likely to be deceived, and were in fact

4    misled, by Defendants' misrepresentations and omissions.

5          92.    Whole Foods knows or reasonably should know that the marketing and

6    sale of its Meat Products was and is deceptive.

7          93.    Plaintiff Grass has suffered injury in fact, including the loss of money,

8    as a result of Defendants' unlawful, unfair, and/or deceptive practices.  Plaintiff

9    Grass and members of the Class were directly and proximately injured by Whole

10   Foods' conduct and lost money as a result of Whole Foods' material

11   misrepresentations and/or omissions, because they would not have purchased or paid

12   as much for Meat Products had they known that Whole Foods does not ensure

13   compliance with its animal welfare standards or that key animal welfare standards

14   from its 5-Step® Rating System do not ensure meaningful improvement over

15   common industry practice.

16         94.    PETA has also suffered injury in fact as a result of Defendants'

17   unlawful, unfair, and/or deceptive practices, because PETA has been required to

18   incur costs and divert resources educating the public about the inadequacy and

19   misleading nature of Defendants' 5-Step® Rating System and Defendants' related

20   material misrepresentations and/or omissions.

21         95.    All of the wrongful conduct alleged herein occurred, and continues to

22   occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part

23   of a general practice that is still being perpetuated and repeated throughout the State

24   of California.

25         96.    Plaintiffs request that this Court enter such orders or judgments as may

26   be necessary to enjoin Defendants from continuing its unfair and deceptive business

27   practices, to restore to Plaintiff Grass and members of the Class any money that

28

1   Defendants acquired by unfair competition, and to provide such other relief as set

2   forth below.

3                           **SECOND CAUSE OF ACTION**

4           **VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT**

5                       (CAL. CIV. CODE § 1750, *et seq.*)

6        97.    Plaintiffs reallege and incorporate by reference all paragraphs alleged

7   herein.

8        98.    Plaintiff Grass brings this claim on behalf of herself and all Class

9   members.

10       99.    Defendants are "persons" under Cal. Civ. Code § 1761(c).

11       100.   Plaintiff Grass and Class members are "consumers," as defined by Cal.

12   Civ. Code § 1761(d), who purchased Defendants' Meat Products.

13       101.   Cal. Civ. Code § 1770(a)(2) prohibits "[m]isrepresenting the source,

14   sponsorship, approval, or certification of goods or services."

15       102.   Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or

16   services have sponsorship, approval, characteristics, ingredients, uses, benefits, or

17   quantities which they do not have…."

18       103.   Cal. Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or

19   services are of a particular standard, quality, or grade, or that goods are of a

20   particular style or model, if they are of another."

21       104.   Whole Foods violated these provisions of the CLRA by misrepresenting

22   the sponsorship, approval, certification, characteristics, benefits, standards, and

23   quality of its Meat Products and omitting disclosure of material aspects thereof in its

24   advertising.

25       105.   As alleged herein, Whole Foods' advertising for its Meat Products

26   creates the impression of ensuring superior treatment for animals and therefore

27   superior quality Meat Products.  Whole Foods failed to disclose in its advertisements

28   for Meat Products that it does not ensure compliance with its animal welfare

                                     - 32 -

THIRD AMENDED COMPLAINT
010529-11  851056 V2

standards and that key animal welfare standards from its 5-Step® Rating System do not ensure meaningful improvement over common industry practice.

106.   Whole Foods had a duty to disclose in its advertising that it does not ensure compliance with its animal welfare standards, arising from (1) its superior knowledge regarding the audit process, *e.g.* through its financial sponsorship of GAP and because at least two members of the GAP board of directors have been or are currently Whole Foods employees; and (2) its partial representations and/or misrepresentations to the contrary in its advertising, *i.e.*, that its Meat Products are certified by the Global Animal Partnership, creating the impression that the Meat Products are in compliance with those standards.

107.   Whole Foods had a duty to disclose in its advertising that key standards in the GAP 5-Step® Rating System fail to ensure improved animal welfare, arising from (1) its superior knowledge of prevailing industry standards as compared to the typical consumer, *e.g.* through its financial sponsorship of GAP and because at least two members of the GAP board of directors have been or are currently Whole Foods employees; and (2) its partial representations and/or misrepresentations to the contrary in its advertising, *i.e.* "no cages" for meat chickens implies that chickens raised for meat are usually kept in cages.

108.   Whole Foods' omissions are material, because reasonable consumers would consider the omitted facts, including the failure of key Whole Foods/GAP standards to exceed industry norms and Whole Foods/GAP's illusory auditing standards to be important in determining whether or not to purchase Meat Products.

109.   Reasonable consumers were likely to be deceived, and were in fact misled, by Defendants' misrepresentations and omissions.

110.   Whole Foods knows or reasonably should know that the marketing and sale of its Meat Products was and is deceptive.

111.   Plaintiff Grass and members of the Class were directly and proximately injured by Whole Foods' conduct and lost money as a result of Whole Foods'

- 33 -

1  material misrepresentations and/or omissions, because they would not have

2  purchased or paid as much for Meat Products had they known that Whole Foods

3  does not ensure compliance with its animal welfare standards or that key animal

4  welfare standards from its 5-Step® Rating System do not ensure meaningful

5  improvement over common industry practice.

6      112.   All of the wrongful conduct alleged herein occurred, and continues to

7  occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part

8  of a general practice that is still being perpetuated and repeated.

9      113.   In accordance with Civil Code § 1780 (a), Plaintiff Grass and members

10  of the Class seek injunctive and equitable relief for Whole Foods' violations of the

11  CLRA, including an injunction to enjoin Defendants from continuing their deceptive

12  advertising and sales practices.

13      114.   In accordance with Section 1782(a) of the CLRA, Civ. Code § 1782(a),

14  on September 21, 2015, Plaintiff William's counsel served Defendants with notice of

15  their alleged violations of the CLRA by certified mail, return receipt requested.

16  Within 30 days of the date of such notification, Defendants failed to provide

17  appropriate relief for their violations of the CLRA.  Therefore, in accordance with

18  Section 1782(b)-(d) of the CLRA, Civ. Code § 1782(b)-(d), Plaintiff Grass is entitled

19  to maintain an action for damages under Section 1780 of the CLRA, Civ. Code §

20  1780.  Plaintiff Grass and the members of the Class have all been directly and

21  proximately damaged as a result of Defendants' use or employment of the acts,

22  methods and/or practices enumerated in the preceding paragraphs of this Complaint

23  and, therefore, Plaintiff Grass and the members of the Class are entitled to bring this

24  action against Defendants and to recover and/or obtain relief, including actual

25  damages, injunctive relief, restitution of money or property, such other relief as

26  provided in Civil Code § 1780 and the Prayer for Relief, and any other relief which

27  this Court deems proper.

28

THIRD AMENDED COMPLAINT
010529-11  851056 V2

115.   Plaintiff Grass includes an affidavit with this Complaint reflecting that venue in this District is proper, to the extent such an affidavit is required by Cal. Civ. Code § 1780(d) in federal court.

## THIRD CAUSE OF ACTION

### VIOLATIONS OF THE FALSE ADVERTSING LAW
#### (CAL. BUS. & PROF CODE §§ 17500, *et seq.*)

116.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

117.   Plaintiff PETA brings this claim on behalf of itself and Plaintiff Grass brings this claim on behalf of herself and all Class members.

118.   California Business & Professions Code §§ 17500, *et seq.* (the "FAL") broadly proscribes deceptive advertising in this State.  Section 17500 makes it unlawful for any corporation intending to sell products or perform services to make any statement in advertising those products or services concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or not to sell those products or services as advertised at the price stated therein, or as so advertised.

119.   When the seller has a duty to disclose material facts about a product, the sale of the product to consumers without disclosure of such material facts runs afoul of the FAL.

120.   As alleged herein, Whole Foods' advertising for its Meat Products creates the impression of ensuring superior treatment for animals and therefore superior quality Meat Products.  Whole Foods failed to disclose in its advertisements for Meat Products that it does not ensure compliance with its animal welfare standards and that key animal welfare standards from its 5-Step® Rating System do not ensure meaningful improvement over common industry practice.

THIRD AMENDED COMPLAINT
010529-11  851056 V2

1    121.   Whole Foods had a duty to disclose in its advertising that it does not

2    ensure compliance with its animal welfare standards, arising from (1) its superior

3    knowledge regarding the audit process, *e.g.* through its financial sponsorship of GAP

4    and because at least two members of the GAP board of directors have been or are

5    currently Whole Foods employees; and (2) its partial representations and/or

6    misrepresentations to the contrary in its advertising, *i.e.*, that its Meat Products are

7    certified by the Global Animal Partnership, creating the impression that the Meat

8    Products are in compliance with those standards.

9    122.   Whole Foods had a duty to disclose in its advertising that key standards

10   in the GAP 5-Step® Rating System fail to ensure improved animal welfare, arising

11   from (1) its superior knowledge of prevailing industry standards as compared to the

12   typical consumer, *e.g.* through its financial sponsorship of GAP and because at least

13   two members of the GAP board of directors have been or are currently Whole Foods

14   employees; and (2) its partial representations and/or misrepresentations to the

15   contrary in its advertising, *i.e.* "no cages" for meat chickens implies that chickens

16   raised for meat are usually kept in cages.

17   123.   Whole Foods' misrepresentations and omissions are material, because

18   reasonable consumers would consider the omitted facts, including the failure of key

19   Whole Foods/GAP standards to exceed industry norms and Whole Foods/GAP's

20   illusory auditing standards to be important in determining whether or not to purchase

21   Meat Products.

22   124.   Reasonable consumers were likely to be deceived, and were in fact

23   misled, by Defendants' misrepresentations and omissions.

24   125.   Whole Foods knows or reasonably should know that the marketing and

25   sale of its Meat Products was and is deceptive.

26   126.   Plaintiff Grass has suffered injury in fact, including the loss of money,

27   as a result of Defendants' unlawful, unfair, and/or deceptive practices.  Plaintiff

28   Grass and members of the Class were directly and proximately injured by Whole

- 36 -

Foods' conduct and lost money as a result of Whole Foods' material misrepresentations and omissions, because they would not have purchased or paid as much for Meat Products had they known that Whole Foods does not ensure compliance with its animal welfare and quality standards or that key animal welfare and quality standards from its 5-Step® Rating System do not ensure meaningful improvement over common industry practice.

127.   PETA has also suffered injury in fact as a result of Defendants' unlawful, unfair, and/or deceptive practices, because PETA has been required to incur costs and divert resources educating the public about the inadequacy and misleading nature of Defendants' 5-Step® Rating System and Defendants' related material misrepresentations and/or omissions.

128.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a general practice that is still being perpetuated and repeated.

129.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair and deceptive business practices, to restore to Plaintiff Grass and members of the Class any money that Defendants acquired by unfair competition, and to provide such other relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PETA on behalf of itself, and Plaintiff Grass, individually and on behalf of all others similarly situated, respectfully request that this Court enter a judgment against Defendants and in favor of Plaintiffs, and grant the following relief:

A.      Determine that this action may be maintained as a Class action with respect to the Class identified herein and certify it as such under Rules 23(b)(2) and/or 23(b)(3), or alternatively certify all issues and claims that are appropriately

- 37 -

1    certified, and designate and appoint Plaintiff Grass as Class Representatives and her

2    counsel as Class Counsel;

3         B.     Declare, adjudge and decree the conduct of the Defendants as alleged

4    herein to be unlawful, unfair and/or deceptive;

5         C.     Enjoin Defendants from continuing the unfair and deceptive marketing

6    and sale of their Meat Products;

7         D.     Award Plaintiff Grass and the Class restitution of all monies paid to

8    Defendants as a result of their unfair and deceptive business practices;

9         E.     Actual damages and such other relief as provided in Cal. Civ. Code §

10   1780;

11        F.     Award Plaintiffs and the Class reasonable attorneys' fees, costs, and

12   pre- and post-judgment interest; and

13        G.     Award Plaintiffs and the Class such other further and different relief as

14   the nature of the case may require or as may be determined to be just, equitable, and

15   proper by this Court.

### JURY TRIAL DEMAND

16

17        Plaintiffs, by counsel, request a trial by jury for all claims so triable.

18

19   DATED: February 16, 2016          HAGENS BERMAN SOBOL SHAPIRO LLP

20
                                       By: _/s/ Steve W. Berman_____
21                                     Steve W. Berman (admitted *pro hac vice*)
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
22                                     1918 Eighth Avenue, Suite 3300
                                       Seattle, WA  98101
23                                     Telephone:  (206) 623-7292
                                       *steve@hbsslaw.com*
24

25

26

27

28

- 38 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Elaine T. Byszewski (SBN 222304)
Christopher R. Pitoun (SBN 290235)
301 N. Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150
*elaine@hbsslaw.com*
*christopherp@hbsslaw.com*

*Attorneys for Plaintiffs and the Proposed
Class*

THIRD AMENDED COMPLAINT
010529-11  851056 V2